IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHOBANA SHANKAR and RAGHAVENDRA JAYANTH CHAKRAVARTHY, *Plaintiffs*, v. FAIRVIEW AVENUE PROPERTIES LLC, et al., *Defendants*. | No. 23 C 1469 Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Shobana Shankar and Raghavendra Jayanth Chakravarthy claim Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked them into buying five run-down apartment buildings. While holding themselves out as their real-estate brokers, Mikosz and Chojnacki allegedly fed them false assurances about the buildings' condition and profitability. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through puppet entities, bought the buildings and resold them to Plaintiffs at a significant markup. Plaintiffs sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). Defendants now move to dismiss. (Dkts. 66, 69). For the reasons below, the motions [66, 69] are denied.

### BACKGROUND

Plaintiffs Shobana Shankar and Raghavendra Jayanth Chakravarthy are a married couple living in California. (Dkt. 1 ¶ 25). In February 2022, Shankar saw an advertisement on Facebook for CitiPoint Properties ("CitiPoint"). (*Id.* at ¶ 26).[1] According to the advertisement, CitiPoint

---

[1] At the time, CitiPoint was an "unincorporated enterprise," organized by Defendant Marcin Chojnacki, that appeared to be a real-estate investment firm. (*Id.* at ¶ 19). Later, on December 28, 2022, CitiPoint reorganized as Citypoint Illinois, LLC, which is owned and controlled by non-party Citypoint Group, Inc. (*Id.*)

1

helped real-estate investors find undervalued and underperforming properties—so-called "directly sourced" properties. (*Id.* at ¶¶ 26–27). The advertisement promised "rapidly increasing equity and high cash flow." (*Id.* at ¶ 28). Responding to the Facebook advertisement, Shankar sent a message to CitiPoint. (*Id.* at ¶ 29). Defendant Lori Mikosz, who was in Illinois, replied, telling Shankar that her company introduces "mom and pop" property owners to investors. (*Id.* at ¶¶ 30, 34). Mikosz explained that Shankar could invest in a building that was underperforming due to its ownership and self-management by a local, unprofessional landlord. (*Id.* at ¶¶ 34–35). By purchasing property at a bargain and using an affiliate property-management service, Defendant Mainstreet Property Management LLC ("Mainstreet"), Mikosz proposed, Shankar could expect "substantial cash flow." (*Id.* at ¶ 35).

In the spring and summer of 2022, Mikosz and Shankar engaged in "sustained email, text and phone interactions." (*Id.* at ¶ 30). Mikosz told Shankar that she and Chojnacki were real estate brokers with Chase Real Estate, LLC ("Chase RE"), an affiliate of CitiPoint. (*Id.* at ¶ 31). Mikosz led Shankar to believe that Mikosz and Chojnacki were agents of Chase RE, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶ 32). At the time, the CitiPoint website was "a virtual reflection" of Chase RE's website. (*Id.* at ¶ 33, *see* Dkts. 1-1, 1-2). Mikosz sent Shankar information via email regarding five apartment properties: (1) the Fairview Property; (2) the 135th Place Property; (3) the Melrose Park Property; (4) the 18350 Torrence Property; and (5) the 17909 Torrence Property (collectively the "Properties"). (*Id.* at ¶¶ 37, 38, 57, 77, 100, 122).

Through the negotiations for all five properties, Mikosz and Chojnacki "held themselves out to be agents of and acting on behalf of the Plaintiffs." (*Id.* at ¶ 150). Mikosz represented all five properties were "in good condition and fully leased with tenants who were all current in their

2

rent." (*Id.* at ¶¶ 40, 58, 79, 102, 123). CitiPoint's Property Information Portal provided rent rolls for each building that corroborated Mikosz's representations. (*Id.* at ¶¶ 44, 62, 87, 109, 127). Moreover, the Portal provided a detailed cash flow analysis for each building to show their profitability at their respective purchase price. (*Id.* at ¶¶ 41, 59, 80, 103, 124). Relying upon Mikosz's and Chojnacki's representations, Plaintiffs purchased all five properties between February and May 2022 and hired Mainstreet to manage the properties. (*Id.* at ¶¶ 35, 37, 149, 157).

Unbeknownst to Plaintiffs, the counterparties to the sale were not "mom and pop" landlords, but various Defendant-entities:

- Fairview Avenue Properties LLC ("Fairview Avenue"): Solely owned and managed by Mon Ami TCF LLC ("Mon Ami"). (*Id.* at ¶ 9). Mon Ami is owned and managed by Defendant Anand Sheth and Defendant Kathleen Long, who is also Chojnacki's roommate and "paramour." (*Id.* at ¶¶ 8, 10).

- 18350 Torrence LLC ("18350 Torrence"): Solely owned and managed by TCF National Holdings Inc. ("TCF National"). (*Id.* at ¶ 7). Long is the sole member and President of TCF National. (*Id.* at ¶ 8).

- 2118 Blue Island LLC ("2118 Blue Island"), 1630 N 1 LLC ("1630 N 1"), and Torrence 2 LLC ("Torrence 2"): Managed and owned by Illinois Assets LLC. Illinois Assets is owned and controlled by Chojnacki and Defendant Robert Rixer. (*Id.* at ¶¶ 11–13, 21)

Throughout the dealings with Plaintiffs, Defendant Rebecca Irwin acted on behalf of Fairview Avenue, 2118 Blue Island, 1630 N 1, 18350 Torrence, and Torrence 2 and Defendant Midwest Title and Closing Services LLC ("Midwest Title"). (*Id.* at ¶ 52). Through Midwest Title, Irwin provided "registered agent services to the various puppet entities"; she housed "various legal operations" relating to the entities and deals; and she charged Shankar a fee for "closing coordination." (*Id.* at ¶ 153). Midwest Title—managed by Irwin and nonparty XYZABC, Inc., of which Irwin is the president—shares office space with Irwin, Chojnacki, Mikosz, Mainstreet, and

3

Defendant EJ Investment Group Inc. ("EJ Investment"), which owns and controls Mainstreet. (*Id.* at ¶¶ 15, 17, 23, 154).

After taking ownership, Plaintiffs discovered the Properties were not fully leased and the tenants were not current in rent; rather, multiple tenants were in eviction proceedings or in arrears. (*Id.* at ¶ 148). Nor were the Properties' purchase prices "bargains" since the Defendants purchased the Properties at low prices and resold them at a premium, all while advertising inflated property values:

- The Fairview Property: In February 2022, Mikosz emailed Shankar information about this property. (*Id.* at ¶ 38). Later that month, Defendants sold the property for $450,000 to Plaintiffs, but had purchased the property for $300,000 two months earlier. (*Id.* at ¶¶ 50–51).

- The 135th Place Property: On March 17, 2023, Plaintiffs entered a contract to purchase the property for $400,000. (*Id.* at ¶¶ 60, 69). Prior to closing, on April 26, 2022, Plaintiffs learned that the 135th Place Property's title report "reflected a recently recorded deed" on March 28, 2022, contradicting the representation that Plaintiffs were buying the property directly from a "retiring mom and pop who had owned the property for many years." (*Id.* at ¶¶ 70, 75). When confronted, Mikosz stated that the old couple transferred the property to an LLC while restructuring their assets and this was not a sales transaction. (*Id.* at ¶ 71). In reality, the recorded deed reflected Defendants' purchase of the property for $320,000, prior to the parties' closing on May 19, 2022. (*Id.* at ¶¶ 73, 75).

- The Melrose Park Property: Defendants advertised that the property was worth $1 million. (*Id.* at ¶ 82). On August 15, 2022, Plaintiffs closed on the property for $850,000 but Defendants had purchased the property one month earlier on July 7, 2022 for $695,000. (*Id.* at ¶¶ 96, 98).

- The 18350 Torrence Property: Defendants advertised that the property was worth $590,000. (*Id.* at ¶ 105). Defendants purchased the property for $387,000 and entered into contract to sell it to Plaintiffs less than a month later for $517,000. (*Id.* at ¶¶ 108, 116–17).

- The 17909 Torrence Property: The parties were scheduled to close on the 17909 Torrence Property on August 24, 2022, but Defendants did not have title to the property yet. (*Id.* at ¶ 140). Under the guise of a health emergency, Defendants requested an extension on the closing so they could acquire the property title first. (*Id.* at ¶¶ 139–40). On August 26, 2022, Defendants acquired the title of the

4

property for $360,000 and closed the sale with Plaintiffs on that same day for $430,000. (*Id.* at ¶ 142).

Moreover, Defendants did not comply with inspection requirements, and the Properties were not up to code. (*Id.* at ¶¶ 157–61). For months before the deal, the cities of Blue Island, Melrose Park, and Lansing had "direct[ed] building code violations at the Defendants." (*Id.* at ¶¶ 158–60). As a result, Plaintiffs received fines and citations. (*Id.* at ¶ 162). Despite these issues, Defendants, through Mainstreet, have continued to conceal and falsify rent records, conceal building occupancy and code violations, charge Plaintiffs for work on undisclosed violations, and fabricated billing for unexplained costs. (*Id.* at ¶ 164). Defendants have tried to "repeat the scam" by offering Plaintiffs additional properties. (*Id.* at ¶ 165). Defendants have allegedly scammed at least four other investors like Plaintiffs. (*Id.* at ¶¶ 166–67).

Plaintiffs Shankar and Chakravarthy filed this suit on March 9, 2023. (Dkt. 1).[2] In Count I of the Complaint, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (*Id.* at ¶¶ 168–88). Count II is a common-law fraud claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 189–96). Count III states a breach of contract claim against Fairview Avenue, Torrence 2, 1630 N 1, 18350 Torrence, and 2118 Blue Island, alleging that their contracts falsely represented that the Seller had not received building-code violations. (*Id.* at ¶¶ 197–202). Count IV(A)[3] brings another breach of contract claim against the same Defendants, alleging that they breached their contractual duty to provide the Buyer with

---

[2] This is one of eleven related actions proceeding before this Court. *See* Amended Complaint, *Malik v. Prairie Raynor LLC*, No. 23-cv-01182 (N.D. Ill. Mar. 2, 2023); Complaint, *Abbas v. Mikosz*, No. 23-cv-01691 (N.D. Ill. Mar. 17, 2023); Complaint, *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Chen v. Chojnacki*, No. 23-cv-02520 (N.D. Ill. Apr. 21, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Avenue Properties, LLC*, No. 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Stafford v. Chojnacki*, No. 23-cv-03173 (N.D. Ill. May 19, 2023); Complaint, *Hui v. Chojnacki*, No. 23-cv-03430 (N.D. Ill. May 31, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).
[3] In their Complaint, Plaintiffs referenced Count IV twice. To avoid confusion, the Court will distinguish the counts as Count IV(A) and Count IV(B).

5

an accurate rent roll. (*Id.* at ¶¶ 203–10). Count IV(B) alleges that Mikosz and Chojnacki violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.* (*Id.* at ¶¶ 211–18). Count V alleges Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq.* (*Id.* at ¶¶ 219–25). Last, Count VI brings a negligent-misrepresentation claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 226–33). Chase RE, joined by the remaining Defendants, now moves to dismiss the Complaint for failure to state a claim. (Dkt. 66; *see also* Dkts. 67–68, 70–71). Separately, Defendants Fairview Avenue, Torrence 2, 1630 N 1, 18350 Torrence, and 2118 Blue Island move to dismiss Counts III and IV(A) for failure to state a claim. (Dkt. 69).

**LEGAL STANDARD**

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any

6

newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

## DISCUSSION

I. **Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)**

In Count I, Plaintiffs allege that Chojnacki, Mikosz, Long, Citypoint Illinois, Fairview Avenue, Torrence 2, 1630 N 1, 18350 Torrence, 2118 Blue Island, Mon Ami, Mainstreet, Illinois Assets, and TCF National (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 1 ¶¶ 168–78), while the remaining Defendants Midwest Title, Irwin, EJ Investment, Chase RE, Sheth, and Rixer (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 179–84). Defendants challenge Plaintiffs' claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing similar schemes to defraud other plaintiffs by the same or similar defendants[4]—give Plaintiffs' claims a plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

A. **Section 1962(c)**

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring

---

[4] *See* Amended Complaint, *Malik*, No. 23-cv-01182; Complaint, *Abbas*, No. 23-cv-01691; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Chen*, No. 23-cv-02520; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Stafford*, No. 23-cv-03173; Complaint, *Hui*, No. 23-cv-03430; Complaint, *Fernandez*, No. 23-cv-04406.

7

lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

1. **Conduct of an Enterprise**

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply, this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or

8

participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

Here, Plaintiffs have sufficiently pleaded an association-in-fact enterprise with purpose, relationships, and longevity. They allege that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the "CitiPoint Enterprise." (Dkt. 1 ¶¶ 169–70). That enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (*Id.* at ¶ 171). To ensure the CitiPoint Enterprise's profit at the expense of investors like Plaintiffs, its members allegedly worked on both sides of real-estate transactions. Mikosz and Chojnacki worked together from their shared office, doing business as CitiPoint (later, as Citypoint Illinois). Mikosz and Chojnacki portrayed themselves as brokers for Chase RE, an affiliate of CitiPoint, and drew Plaintiffs in with promises of too-good-to-be-true investment opportunities. Mikosz and Chojnacki stated that Plaintiffs would be purchasing directly from "mom and pop" landlords "who don't have the energy to handle real estate anymore," (*Id.* at ¶ 34), and they encouraged Plaintiffs to trust their numerous and repeated misstatements about the Properties' condition and profitability. While Plaintiffs agreed to buy the Properties for $2.647 million, Long (Chojnacki's "paramour" and roommate), Rixer, Sheth, and Chojnacki, through TCF National, Fairview Avenue, 2118 Blue Island, 1630 N 1, Mon Ami, 18350 Torrence, Illinois Assets, bought the Properties and resold them to Plaintiffs at a $585,000 profit. Behind the scenes, Irwin helped pulled the strings on the complex web of "puppet entities" that helped shield the conflicts of interest from view.

The sophisticated coordination and relationships among Defendants on both sides of Plaintiffs' purchase reflect "an unusual degree of economic interdependence" that helps nudge the existence of the CitiPoint Enterprise across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud.") (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged scheme. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the CitiPoint Enterprise looks more like a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged CitiPoint Enterprise lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases. *See Walgreen*, 719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). After Plaintiffs closed on the Properties, Defendants continued to offer them additional properties and, through Mainstreet, charged Plaintiffs for "exorbitant charges for work on" undisclosed "building occupancy and code violations." (*Id*. at ¶¶ 164(a), (b)). Defendants have allegedly scammed at least four other investors like Plaintiffs.

Defendants contend that Plaintiffs have failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise.'" (Dkt. 66-1 at 7); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at

10

854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Plaintiffs' allegations suggest that the CitiPoint Enterprise is distinct from each of the § 1962(c) Defendants who served as members. Unlike the enterprise's members—who are "persons," capable of holding property— the CitiPoint Enterprise is a network of individuals and entities, associated in fact, and thus unable to "hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Plaintiffs have alleged the existence of a distinct enterprise.

Plaintiffs have also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the CitiPoint Enterprise's affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir.

11

1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchy of the CitiPoint Enterprise may be unclear. Yet, Plaintiffs have alleged that Chojnacki and Mikosz, through Citypoint Illinois, attracted and purported to represent unwitting investors while Long, Rixer, and Sheth, through their various controlled entities, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprise.

### 2. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Plaintiffs' satisfaction of the relationship-plus-continuity test, they argue that Plaintiffs have failed to adequately plead predicate acts. (Dkt. 66-1 at 8–11). As predicate acts, Plaintiffs allege mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Dkt. 1 ¶¶ 174–75). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use

12

of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Plaintiffs' allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Plaintiffs must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since "fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Plaintiffs allege that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'directly sourced' real estate opportunities." (*Id.* at ¶ 175(a)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) Plaintiffs allege further that Defendants engaged in a "sustained

13

fiction," "replete with misrepresentations and calculated omissions" to mislead Plaintiffs into believing that they were buying property from an "old retiring couple" at a bargain. (*Id.* at ¶ 175(b)). Plaintiffs' RICO Count incorporates his previous, more detailed allegations. (*See id.* at 26). While some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud.

In February 2022, using wired communication, Mikosz replied to Shankar's response to a Facebook advertisement for CitiPoint (now Citypoint Illinois). (*Id.* at ¶¶ 26–30). From Illinois, Mikosz told Shankar, in California, that CitiPoint could help her buy underperforming real estate from "mom and pop" property owners and make "substantial cash flow" with proper management. (*Id.* at ¶¶ 32–35). In the spring and summer of 2022, Mikosz and Shankar engaged in "sustained email, text and phone interactions." (*Id.* at ¶ 30). Mikosz and Chojnacki represented to Shankar all "transactions would be safely negotiated and consummated under the auspices of" Chase RE and that they were Plaintiffs' agents and acting on Plaintiffs' behalf. (*Id.* at ¶¶ 32, 150). For example, in February 2022, Mikosz emailed Shankar about the Fairview Property, representing it was in good condition and fully leased; she even pointed her to a Property Information Portal with detailed cash flow analyses. (*Id.* at ¶¶ 38–41). Plaintiffs allege Mikosz made these false statements with intent to defraud them. (*Id.* at ¶¶ 35, 175, 180); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))). Believing Mikosz's representations, Shankar agreed to buy the Fairview Property on February 24, 2022. (*Id.* at ¶¶ 48–50). But in truth, the seller was Fairview Avenue, owned and controlled by Long (Chojnacki's roommate and paramour) and Sheth. (*Id.* at ¶¶ 49–51). Through his corporate entity, Rixer engaged in a similar bait-and-switch scheme with the other Properties. (*See id.* at ¶¶ 95–98).

14

Long, Sheth, and Rixer, using Fairview Avenue, Mon Ami, 1630 N 1, Torrence 2, 2118 Blue Island, and 18350 Torrence, participated in the alleged fraudulent scheme by purchasing and reselling the Properties to Plaintiffs. (*Id.* at ¶¶ 7–13, 21, 73, 117, 142). Considering the intertwined relationships among Long, Chojnacki, Rixer and Sheth, it is plausible to infer that they—and by extension, their LLCs—contributed to the scheme with fraudulent intent. Plaintiffs' well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[5] Accordingly, Plaintiffs' § 1962(c) claim survives.

**B.      Section 1962(d)**

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of a substantive criminal offense, but it suffices that he would adopt the goal of furthering or

---

[5] Plaintiffs allege that "[t]he CitiPoint Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (*Id.* at ¶ 173).

15

facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

Defendants argue that Plaintiffs' § 1962(d) claim fails because his § 1962(c) claim is deficient. (Dkt. 66-1 at 6–7); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012) ("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Plaintiffs have stated a claim under § 1962(c). Defendants raise no other arguments against Plaintiffs' § 1962(d) claim, and the Court declines to invent arguments on their behalf. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))). Thus, Count I may proceed in its entirety.

**II.     State-Law Claims (Counts II–VI)**

In Plaintiffs remaining claims under state law, they allege common-law fraud (Count II); breach of contract (Counts III & IV(A)); violation of the ICFA (Count IV(B)); violation of the IRELA (Count V); and negligent misrepresentation (Count VI). (Dkt. 1 ¶¶ 189–233).

**A.     Fraud, ICFA, IRELA, and Negligent Misrepresentation**

With scant citations to caselaw, the Chase RE Defendants contend that Counts II, IV(B), V, and VI sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Plaintiffs' RICO claim. (Dkt. 66-1 at 11–14). Again, the Plaintiffs have stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of these state-law claims, Defendants have waived any arguments they might have made. *See Wernstein v.*

16

*Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

**B.     Breach of Contract**

In Counts III and IV(A), Plaintiffs bring breach-of-contract claims against Fairview Avenue, Torrence 2, 1630 N 1, 18350 Torrence, and 2118 Blue Island. (Dkt. 1 ¶¶ 197–210). Defendants argue—and Plaintiffs appears to concede, (Dkt. 77 at 2)—that the breach-of-contract claims sound in fraud, and they are subject Rule 9(b)'s heightened pleading standard. (Dkt. 69 at 2–3). Even so, Plaintiffs' breach-of-contract claims are viable. To state a claim for breach of contract under Illinois law, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages. *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 64 N.E.3d 1178, 1186 (Ill. App. Ct. 2016)).

In Count III, Plaintiffs claim Defendants breached their covenant in the Properties' purchase agreement by representing that they were not aware of any building-code violations. In the agreement, Defendants promised that they had "not received written notice from any governmental body or owner association regarding . . . zoning, building, fire or health code violations that have not been corrected." (Dkt. 1 ¶ 198). Yet, after entering this valid contract, Plaintiffs learned that Defendants' promise was false. (*Id.* at ¶¶ 161, 199). For months before the deal, the cities of Blue Island, Melrose Park, and Lansing had "direct[ed] building code violations at the Defendants." (*Id.* at ¶¶ 158–60). Presumably, Defendants were aware of those violations—permitting a plausible inference that it breached the purchase agreement. That alleged breach made the Properties unprofitable and resulted in significant expenses. (*Id.* at ¶¶ 54, 76, 99, 121, 143, 186). These allegations state a plausible claim for breach of contract.

Then, in Count IV(A), Plaintiffs claim Defendants breached the same purchase agreement—specifically, the obligation to provide a rent roll at closing—by providing a fabricated rent roll. (*Id.* at ¶ 205). Implicit in every contract under Illinois law is a duty of good faith and fair dealing. *Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) (internal citation omitted); *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958). Despite Defendants' argument to the contrary, (Dkt. 69 at 3–4), providing a fabricated rent roll does not indicate good-faith performance of their obligation; it is a plausible breach. *See, e.g.*, *Burger v. Spark Energy Gas, LLC*, 507 F. Supp. 3d 982, 990 (N.D. Ill. 2020) (observing that the duty of good faith and fair dealing may support a breach-of-contract claim). So Plaintiffs have stated a claim for breach of contract in Count IV(A).

## CONCLUSION

For the reasons above, Defendants' Motions to Dismiss [66, 69] are denied in their entirety. Plaintiffs' claims in Counts I–VI may move forward consistent with this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: December 6, 2023