**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHOBANA SHANKAR, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 23 C 1469 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| FAIRVIEW AVENUE PROPERTIES LLC, | ) | |
| *et al.*, | ) | |
| | ) | |
| *Defendants*. | | |

**MEMORANDUM OPINION & ORDER**

Out-of-state residents Shobana Shankar and Raghavendra J. Chakravarthy (collectively "Plaintiffs" or "Shankar Plaintiffs") brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 110). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Plaintiffs: Defendants First National Financial, Inc. and Kathleen Long ("Long Defendants") (Dkt. 282) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt.

---

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

[2] The Chojnacki Defendants include the following natural persons and entities: Marcin Chojnacki; Robert Rixer; 18350 Torrence, LLC; 2118 Blue Island LLC; 1630 N 1 LLC; Citypoint Illinois LLC; EJ Investment Group, Inc.; Fairview Avenue Properties LLC; Mainstreet Property Management LLC; TCF National Holdings, Inc.; Torrence 2 LLC.

284). In this case, Plaintiffs' Amended Complaint alleged that the Chojnacki and Long Defendants violated 18 U.S.C.§ 1962(c), (d), (Dkt. 140 ¶¶ 236–246).

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 284) and the Long Defendants' Motion (Dkt. 282) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Long Defendants' Motion on Count V. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count V), which remains in the case and will proceed to trial unless the parties can reach a settlement.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

## II. The Shankar Plaintiffs

With that, the Court turns to the facts that connect the Shankar Plaintiffs with this complicated web of actors. Shankar and her husband Chakravarthy, California residents, are real estate investors with a portfolio of properties in California and Georgia; prior to the purchase of the Illinois properties at issue, Shankar had never before purchased out-of-state commercial and multifamily unit properties, having previously only rented out the couple's own prior residences. (Dkt. 291 ¶¶ 4–5). The Properties at issue in the instant lawsuit are commonly known as: 12248 Fairview Ave., Blue Island, Illinois (the "Fairview Property"); 2118 135th Place, Blue Island, Illinois (the "135th Property"); 18350 Torrence Avenue, Lansing, Illinois ("18350 Torrence Property"); 17909 Torrence Ave, Lansing, Illinois ("17909 Torrence Property"); 1630 N. 1st Avenue, Melrose Park, Illinois (the "Melrose Park Property"); collectively referred to herein as

the "Properties." (Dkt. 291 ¶ 8). After closing on each property, Shankar hired Mainstreet to manage the building. (Dkt. 291 ¶ 47).

In 2022, Shankar, after seeing a Chase Real Estate advertisement on Facebook, submitted her contact information to learn more about real estate investment in the Chicago area. (Dkt. 291 ¶ 17). Shortly after, Shankar received an email from former defendant Mikosz seeking to help Shankar find a property that was suited to Shankar's investment goals. (Dkt. 291 ¶ 17). Shankar stated in her deposition that she also received a form/automated email from Marcin Chojnacki but did not respond since she had already made contact with Mikosz. (Dkt. 291 ¶ 17). She testified further that Mikosz knew of a number of "off-market" properties that Shankar could purchase for a discount because they were owned by "mom and pop" landlords who were looking to retire and currently undervalued their buildings. (Dkt. 291 ¶¶ 18–19). Shankar observed Chojnacki and Rixer on the Chase/Citipoint websites, but admitted that her only communication with Chojnacki was in relation to his company Mainstreet's property management of the Properties. (Dkt. 291 ¶¶ 20–21).

Shankar, with no experience in the Chicagoland area, testified that she trusted Mikosz and Chase Real Estate for how much they could handle in house; she followed Mikosz' recommendation to look at six-unit apartment complexes, starting first in the Blue Island region with the Fairview Property. (Dkt. 291 ¶¶ 22–24). Shankar never visited the property nor the Chicago area to meet with Mikosz or anyone at Chase. (Dkt. 291 ¶ 25). Shankar purchased the Fairview Property with a $5,000.00 buyer's credit on April 28, 2022 for $450,000.00 after choosing not to have the property appraised prior to purchase because her lender did not require it. (Dkt. 291 ¶¶ 28–29; Dkt. 292 ¶ 6).

Shankar then entered into a purchase agreement for the six-unit 135th Property and was sent the previous sale history for the property; noting a recent sale, she asked Mikosz for an

explanation and Mikosz told her that this was done by the mom-and-pop owners of the property for tax purposes and that it was nothing to worry about. (Dkt. 291 ¶¶ 30–31). As with Fairview, Shankar had Mikosz do due diligence on the property and purchased it sight unseen. (Dkt. 291 ¶ 32). Shankar testified that she closed on the 135th Property on or about May 20, 2022, for $400,000 including a $31,000 buyer's credit and again elected not to have the property apprised before purchasing. (Dkt. 291 ¶¶ 32–33; Dkt. 292 ¶ 7). Shankar next turned to the ten-unit Melrose Park Property and purchased it sight unseen on August 12, 2022, for $850,000.00 inclusive of a $40,000.00 credit. (Dkt. 291 ¶¶ 34–37).

Around the same time, Shankar and Mikosz initiated acquisitions in Lansing, Illinois, where Shankar again made purchases under Mikosz' guidance, sight-unseen. (Dkt. 291 ¶¶ 38–40). Shankar initially agreed to purchase the six-unit 18350 Torrence Property for $555,000, then her lender appraised the property at $480,000. (Dkt. 291 ¶¶ 42–43).[3] Despite this estimate (and despite it being undisputed on another set of the Parties' 56.1 Statements that "Shankar's lender's appraisal estimated that the fair market value of the property was in line with the purchase price," Shankar closed on the six-unit 18350 Torrence Property on August 12, 2022, for $517,000.000. (Dkt. 291 ¶¶ 40–41; Dkt. 292 ¶ 8). Shankar had a similar trajectory with the 17909 Torrence Property: initially agreeing to a $460,000.00 purchase price, the parties negotiated down to $430,000.00 after the lender's appraisal came in at that figure and ultimately closed on August 26th, 2022. (Dkt. 291 ¶¶ 44–45).

[3] (As in other cases, Plaintiffs contend that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.)

After completing all of these purchases, Shankar was alerted to multiple code violations in the Properties which were included in the inspection reports. (Dkt. 291 ¶ 48). Shankar also testified in her deposition that the rent roles provided by Chase as a part of the due diligence process were not accurate as she was required to evict numerous tenants from her properties since they were not paying rent. (Dkt. 291 ¶ 49). Shankar also alleges that Mainstreet mismanaged her properties by failing to properly maintain them, collect rents, and get all work done approved by Shankar. (Dkt. 291 ¶ 49). Thus, Shankar switched property management companies to another company that she found on the Chase website. (Dkt. 291 ¶ 50).

Plaintiff now brings suit on the theory that while negotiating her deals, the Defendants were simultaneously executing their own secret purchases to flip a profit on Shankar by way of actors she understood to be acting in her best interest. Shankar seeks $575,000 for the difference that the Defendants allegedly pocketed between purchasing the five properties and then selling them to Shankar, as well as $467,939 "from unexpected and undisclosed repairs [and] unexpected vacancies." (Dkt. 297 ¶ 79; (Dkt. 291, Exhibit 1). Plaintiff has varying levels of a viable record for her allegations about the prior purchases.

It is undisputed that Defendants Long, Chojnacki, Rixer and former Defendant Sheth made a $1,200,000 acquisition of four Fairview buildings (that jointly appraised for $1,325,000 on Dec. 3, 2021) inclusive of Shankar's Fairview Property; Long (via TCF) took out a $803,400.00 mortgage for the acquisition. (*Michel*, Dkt. 246 ¶ 80, 248 ¶ 80; Dkt. 239, Ex. 63). As for the other Properties, Plaintiff offers up further evidence that the Defendants coordinated to acquire these units while simultaneously assisting her with her purchase, largely through her own Complaint and deposition testimony and an expert report incorrectly stuffed into the 56.1 Statement, regarding the funds from Shankar's transactions as well as representations regarding the owner of the

properties at time of purchase, that the Defendants dispute as immaterial to the present motion. The facts regarding Defendants' alleged other flips on Plaintiff are thoroughly disputed.

Plaintiff also points to an email in which Chojnacki directed Mikosz to alter the inspection report for the Fairview Property prior to giving it to Shankar by removing his name and changing the date from November 2, 2021, to March 8, 2022, the date of Chojnacki's email to Mikosz, which the Chojnacki Defendants dispute as simply wanting to "remain anonymous" and noting that Shankar never disputed the accuracy of the inspection report). (Dkt. 297 ¶¶ 55–56).

## **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## **DISCUSSION**

Shankar alleges that the Chojnacki Defendants (other than Rixer and EJ Investments) and Long Defendants violated § 1962(c), (d) and that Rixer and EJ Investments violated § 1962(d) only.[4] (Dkt. 140 at 34). Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that the Shankar Plaintiffs did not get the benefit of their bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Shankar's claims about back-end damages. Defendants contend that the Shankar Plaintiffs' claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Shankar's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of

[44] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where Rixer and EJ Investments only facing allegations under § 1962(d).

the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates.

Finally, the analysis laid out in the related cases governs the Long Defendants' contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants, not Long. (Dkt. 282-1 at 7). It is possible for a jury to find that Long was sufficiently engaged in the enterprise under § 1962(c) to be liable for the predicate acts despite not being as central to the encounters with Shankar as Mikosz; even if the jury found that Long had nothing to do with the predicate acts, though, Long could potentially still be liable under § 1962(d), which requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). (Long, in her Reply, argues that conspiracy was unpleaded (Dkt. 300 at 5), but the Amended Complaint appears to alternatively plead the conspiracy claim— § 1962(d)—in alleging "§ 1962(c), (d)." (Dkt. 140 at 34)). Of course, it is ultimately possible for a jury to find that the evidence showing that Long's joint venture purchased the Fairview properties and subsequently sold to Plaintiff merely indicated a "business relationship." (Dkt. 282-1 at 2). Yet the argument that NO reasonable jury could find for Plaintiffs on this claim is unpersuasive. Plaintiffs' evidence, though shaky at times, could sufficiently tie the Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities

could allow a jury to infer the Long Defendants knowing participated in the scheme to saddle investors with misrepresented properties in order to make a quick buck.

It is an even closer question whether Plaintiffs have sufficiently presented a case for a jury with regard to Rixer and EJ Investments, who hardly feature in Plaintiffs' Response. Ultimately, though, the Court declines to rule in favor of summary judgment where Plaintiffs have pieced together evidence that could support the view that Rixer and EJ Investments facilitated the passing-around of real estate in order to obscure ownership and trick Plaintiffs into thinking they were getting the deal that Defendants themselves were taking. Although mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment, a "conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from the circumstances that the required elements of conspiracy have been met." *See Chicago Miracle Temple Church, Inc. v. Fox*, 901 F.Supp. 1333, 1348 (N.D.Ill.1995).

As stated above, Plaintiffs cannot proceed on their "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Plaintiffs, however, the Motions for Summary Judgment on Count I are otherwise denied.

## I. State-Law Claims (Counts II–VI)

Next, Chojnacki moves for summary judgment on the Shankar Plaintiffs' state law claims for common-law fraud (Count II), violation of the ICFA (Count V); violation of the IRELA (Count VI); and negligent misrepresentation (Count VII). (Dkt. 284).[5] Plaintiffs' responses on the issues

[5] The Long Defendants also moved for summary judgment on Count V, seemingly out of an abundance of caution, as Long's name was mentioned in the text of a claim that otherwise only references Chojnacki and Mikosz. (Dkt. 282-1 at 8). Indeed, Plaintiffs do not acknowledge Long in their defense of this claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude"

offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

**a. Count II: Common Law Fraud and Count VII: Negligent Misrepresentation**

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants highlight that there is no evidence of any conversation between Shankar and Chojnacki prior to purchase. Plaintiff makes no attempt to dispute this picture, returning instead to the general theory of the 15 related cases rather than any specific allegedly false statements from the Chojnacki Defendants beyond one contention, without citation, that "Defendants further controlled the appraisal and lied about the condition and tenancy of the properties." (Dkt. 243 at 22). That is insufficient. *See United States v. 5443 Suffield Terrace,*

---

a concession). Thus, the Long Defendants' Motion for Summary Judgment on Count V is also granted, to the extent it is not moot via the lack of proper pleading.

*Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[6] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 110 at 33). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response. (Dkt. 294 at 23-24). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Plaintiffs do not make the requisite arguments here, and the court will not do it for them. *See Little v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count V: ICFA**

[6] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases). The named real estate broker on Shankar's sale contract was Mikosz herself, who has settled her claim with Shankar.

In Count V, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's

actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, even if often one-step-removed from direct communication with Shankar (left for Mikosz to handle), was designed to induce Shankar's reliance on the inefficient and old-school seller narrative in order to secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 294 at 24). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Shankar has presented no evidence of damages because he has not sufficiently tied damages to this part of her claim. (Dkt. 228 at 13). Yet Shankar has offered some evidence on the alleged six-figure damages from unexpected repairs, unexpected code compliance, unexpected building code violations and evictions, and it is up to the jury to assess the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer

beyond the singular "seller's identity" quotation to assess the full picture available to Shankar in her dealings with Defendants.

**c. Count VI: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Shankar was arguably a customer, and thus, under the Act, Chojnacki had a duty to refrain from supplying her with false information. (Dkt. 285 at 14). Instead, they argue that "Shankar has admitted that she never spoke with Chojnacki prior to her purchases." *Id.* Chojnacki also contends that "there is no evidence of latent material adverse facts pertaining to the physical conditions that he actually knew about that could not be discovered by reasonably diligent inspection of the property," and thus he complied with Section 15-25 of the Illinois Real Estate Licensing Act. (*Id.*)

Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and

following that with an excerpt from a expert report and general references to dozens of exhibits without citation, the majority of their 56.1 statement, and zero references to case law. Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910 F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count VI.

**CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [284] and the Long Defendants' Motion [282] are granted in part and denied in part. The Motions are

granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Long Defendants' Motion on Count V. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count V), which remains in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026